GENERAL TIRE & RUBBER CO. v. COOPER.

(Division B. Jan. 13, 1936.)

[165 So. 420. No. 32016.]

(Division B.   May 4, 1936.)

[167 So. 801.   No. 32016.]

Roberson & Cook, of Clarksdale, for appellant, on motion to remand.

Maynard, FitzGerald & Venable, and Edward W. Smith, all of Clarksdale, for appellee, on motion to remand.

Roberson & Cook, of Clarksdale, for appellant.

Maynard, FitzGerald & Venable, and Edward W. Smith, all of Clarksdale, for appellee.

Argued orally by **Lake Roberson** and **Sam Cook**, for appellant, and by **W. W. Venable**, for appellee.

**Griffith, J.**, delivered the opinion of the court on motion to remand.

By chapter 252, Laws 1934, it was enacted "that the chancery courts in all litigated cases, upon the request of any party to the suit, shall find the facts specially and state separately its conclusions of law thereon, and its findings and conclusions shall be entered of record and, if an appeal is taken from the decree, shall be included by the clerk in the record which is certified to the supreme court."

The purpose of this statute was to prevent the concealment, in a general decree, of the grounds upon which the trial court proceeded to its final conclusion, leaving the appellate court without record information, necessary to justice in many cases, as to whether the final decision rested upon conclusions of law or upon findings of fact leading to the same conclusion, with the result that cases were often affirmed upon the presumption by the appellate court that the trial court had arrived at a conclusion upon the facts which would support the

decree, when, in truth, the conclusion of the trial judge was to the opposite as to the facts, but his conclusions of law, as applied to the facts actually found by him, were erroneous.

The desirability of such legislation has been generally recognized throughout the country, as is evidenced by statutes of similar import in many other states and by the rule to the same effect in the federal courts. The long delay in its enactment here has been due to the fear that its effect would be to add to the evil of taking cases under advisement, to which we will later refer. But, having been enacted, the statute is mandatory when either or any of the parties at the proper time shall have invoked it. And it is made easy to comply with and without any sort of necessity for any delay, when considered in connection with section 724, Code 1930, which provides that "by means of the court reporter's shorthand notes it shall be competent and effectual for the purposes of appeal and all otherwise, to make of the record every part of the proceedings arising and done during the trial, from the opening until the conclusion thereof."

Long before the statute just mentioned was enacted, the practice of some of the chancellors, as we know from repute and from many records, was as follows: When the testimony had been concluded and the case had been argued, the chancellor (1) would review the evidence in some detail as to each litigated point and outline the processes by which from the various items of the evidence he reached his ultimate conclusion of fact upon each of said litigated points, and thereupon he would state his conclusions of law as applied thereto, and would announce the decree which should be drawn and submitted. This, depending upon the nature of the case and the length of the trial, would sometimes require several minutes, or in some few cases as much as half an hour or even more. Having done this, he would (2) call the court reporter and dictate into the record his

findings of the ultimate facts upon each litigated point of fact, including those which he did not regard as necessary to be decided under his own views of the law, but which might nevertheless be considered as necessary to the case by the appellate court, and then he would briefly state his conclusions of law, usually without any citation of authorities, thereby separately disclosing the processes of ultimate fact and conclusions of law by which he arrived at the decree directed to be taken. It was the purpose of the statute to make it mandatory upon all chancellors, when requested, to do the equivalent of what was done by the chancellors above mentioned, insofar as concerns what they dictated to the court reporter, and as above outlined under numeral 2. It was not the purpose to require to be made of record the review set out under numeral one. In brief, it was the purpose of the statute that there should be a separate finding of the ultimate facts as to each litigated point of fact, but not of the evidentiary facts.

The distinction between evidentiary facts and ultimate facts is generally well enough understood. It will be necessary here only to briefly restate that distinction. An evidentiary fact is one which furnishes evidence of the existence of some other fact; while an ultimate fact is the final resulting effect which is reached by processes of logical reasoning from the evidentiary facts. There are several reasons why the statute did not contemplate or require, on penalty of reversal, a finding or findings of the evidentiary facts; but it is sufficient to say that one and the most important of the reasons is that such a requirement would inevitably aggravate the evil of taking cases under advisement—an evil which has already too much embarrassed the proper administration of justice in the chancery courts.

The requirements of the statute to summarize, are as follows: (1) When either of the parties desires the chancellor to make a separate finding of fact, and thereupon separately his conclusions of law, the party must so re-

quest at the close of the argument and, in any event, before the chancellor has entered upon the delivery of his opinion, or, if no opinion be delivered, then before he announces his conclusions and directions as to the decree to be taken. It is not necessary to make the request by written motion drawn out and filed; a dictation of it to the court reporter, in the presence and hearing of the chancellor, is all that is necessary.

(2) In response thereto the chancellor must state, either in the court reporter's transcript, and preferably so, or else in longhand written out and filed in the case, the ultimate facts upon each contested or litigated point of fact, separately from the conclusions of law, and thereupon his conclusions of law in such manner that the conclusions of fact and of law may be distinguished. And, as we have already observed, he should include in his ultimate findings of fact those controverted issues of fact which the chancellor himself may regard as unnecessary to a decision of the case, but which might be regarded as necessary by the appellate court. This to prevent reversals and remands, such as happened in Bullard v. Citizens' Nat. Bank (Miss.), 160 So. 280, 284. The above summary is in accord with numerous decisions in other jurisdictions under similar statutes, many of which have been gathered in the briefs, and will be shown in the abstract of the briefs by the official reporter.

The point is presented in the arguments as to what ought to be the practice in regard to particularized requests to the chancellor to find as to specified points; and the argument covers the inquiry as to what shall be done, when, under a general request, the chancellor has made his findings, and thereupon or thereafter requests are presented to him to make his findings more complete or specific. We prefer not to attempt any decision upon those particular points at this time. We prefer to have the judgment of the chancellors themselves upon it and to see what they think should be done in that regard before we shall go further than stated in the pre-

ceding paragraphs. These matters should be cautiously worked out by experience and by a process of trial and error in order to finally arrive at a sound, convenient and practicable procedure, and one which at the same time will not operate to delay cases.

The motion here is to remand the case for a more specific finding upon the facts in issue, and appellant insists upon findings which it seems to us would go deeply into the evidentiary facts. But the chancellor has apparently attempted to comply with the statute in this case, and whether he has actually done so we could not tell without a review of the record. It is only when it is apparent on the face of the findings as made by the chancellor and without a review of the remainder of the record that he has either made no attempt to comply with the statute or that his attempt is so inadequate as to amount, in substance, only to an empty gesture, that we will remand on a motion such as made in this case. Any other rule would result in the consideration of such appeals in segregate sections or by piecemeal, and would intolerably consume the time both of the court and of counsel. Wilkinson v. Love, 149 Miss. 517, 111 So. 457, 459.

Motion overruled.

**Ethridge, P. J.,** and **Anderson, J.,** concur.

**Ethridge, P. J.,** delivered the opinion of the court on Suggestion of Error. Original opinion on Merits withdrawn and this opinion substituted.

In the opinion in this case rendered on a former date, there are some errors and omissions which have been called to our attention in the suggestion of error. This suggestion took the usual course of being referred to another judge than the one who wrote the opinion, and on consideration thereof by the court it was decided to respond thereto and make the necessary corrections and supply some of the omissions in the former opinion, and we will set forth, in the opinion on the suggestion of

error, a full statement, so that it will constitute the opinion governing the case.

One W. S. Cooper, now deceased, was, on August 14, 1928, doing business in Clarksdale, Miss., and became indebted to the General Tire & Rubber Company in the sum of ten thousand four hundred sixty-one dollars and forty-one cents. On August 14, 1928, the General Tire & Rubber Company filed a bill in the chancery court of Coahoma county against W. S. Cooper who was operating, in Clarksdale, Miss., a filling station under the name of 7-11 Service Station, and was also operating a filling station at Friars Point, Miss., and had the entire property of W. S. Cooper seized under a writ of sequestration, and all funds in banks garnished under said chancery proceedings. This completely paralyzed Cooper's operations and placed him in an embarrassing situation. He sought to conduct some negotiations with the General Tire & Rubber Company looking to some adjustment so that he might continue his business and repossess his property so seized under the writ of sequestration. On or about September 15, 1928, a contract was entered into by the General Tire & Rubber Company, through its representative, J. F. Sloate, and W. S. Cooper, in which contract it was recited that Cooper was indebted to the General Tire & Rubber Company in the sum of ten thousand four hundred sixty-one dollars and forty cents; that said company had filed the suit in the chancery court; that the parties had tentatively agreed to a plan whereby said indebtedness might be re-evidenced and the business of Cooper reopened; and that it was the desire of said parties to evidence such agreement in writing. It was further stipulated that Cooper agreed to forthwith cause to be organized, at his own expense, a corporation to be known as the 7-11, Inc., with an authorized capital of ten thousand dollars, said corporation to purchase from Cooper, as an individual, the property described in the contract, including all of the property used in the operation of the filling station,

leasehold interests, etc., and all money, wherever deposited in banks, should be turned over to the corporation, and the corporation, so organized, would be personally liable to pay the mentioned indebtedness, and would execute its promissory notes in the required form to evidence such indebtedness. It was then stipulated that these notes were to be for two hundred fifty dollars each, payable on December 1, 1928, and the first day of each month thereafter until December 1, 1932; the balance of said indebtedness to be due and payable on February 1, 1933, said notes to bear interest at six per cent. per annum, and to contain a provision that, in case of failure to pay one of the series, the total indebtedness would be forthwith due and payable, said notes to also contain a provision for the payment of a reasonable attorney's fee if placed in the hands of an attorney for collection. Cooper also agreed that he would pledge to the General Tire & Rubber Company all the stock of the corporation to be formed as collateral security to said notes, said stock to remain pledged, at all times, for that purpose; that he would cause to be elected as secretary and treasurer of said corporation one Cecil Kelly, or such other person as might be nominated by the General Tire & Rubber Company; that he would cause himself to be elected president, and the nominee of the General Tire & Rubber Company to be elected vice president, of said corporation; that he would cause to be entered, by the proper officer, the minutes of said corporation; and that the terms of said officers should be determinable at the will of said corporation. It was further stipulated that Cooper would cause to be elected, on the board of directors of said corporation, a majority of said board nominated by the General Tire & Rubber Company; that he would transfer, in writing, from himself to the nominees of the General Tire & Rubber Company the complete voting power of all the stock in said corporation, with full power in the said nominees to do all things with reference to the voting of said stock that they could do if

they were the full and complete owners thereof. It was also stipulated that satisfactory arrangements would be made prior to the consummation of this agreement looking to the payment of the accounts due by Cooper, which he warranted would not be in excess of one thousand dollars, and with reference to a claim of the Delta Oil Company against Cooper which was in suit in the circuit court of Coahoma county. It was also stipulated that the extension of the indebtedness would be contingent upon Cooper, or the corporation, remaining in possession of said property, and that all of the corporate proceedings relative to the consummation of this agreement should be subject to the approval of the attorneys for the General Tire & Rubber Company, and the salaries of all officers and employees should be subject to the approval of said company, or the directors nominated by it in accordance with the terms of this agreement. It was further stipulated that this agreement, insofar as the General Tire & Rubber Company is concerned, was contingent upon the foregoing conditions and stipulations being faithfully performed by Cooper, and that when satisfactorily performed, the company would accept said notes in extension and renewal of the debt due to it, and would cause the suit to be dismissed without prejudice to its rights, and would direct the sheriff to release the property seized under the sequestration to the corporation so formed. It was further stipulated that the secretary and treasurer of the corporation should have charge of all money of the corporation, including receipts and deposits in banks, and that all the money should be deposited in a named bank unless otherwise directed by the Tire & Rubber Company, and should be withdrawn only on checks signed by the secretary and treasurer, who should also have charge of all the corporation's purchases. It was then stipulated that W. S. Cooper should pledge, by mortgage or otherwise, all of his right, title, and interest in and to the Nu Grape Bottling Company, of Clarksdale,

Miss.; that he would, prior to the consummation of this agreement, sell all of his interest, except as to certain provisions, in the service station at Friars Point, Miss., and would arrange such sale so that the corporation formed would not be, in any wise, responsible for any obligations of said service station.

In accordance with the provisions of this agreement, a corporation was organized and officers and directors selected. Cecil Kelly, who had been bookkeeper for W. S. Cooper, was placed in charge of the accounting and bookkeeping of the corporation formed, and had charge of the business, insofar as purchasing supplies, etc., was concerned. Kelly and Cooper did not get along, frequently had disputes and personal difficulties, and trouble arose between them as to an automobile conveyed to the corporation under the contract. Being dissatisfied with the conduct and management of Kelly and others, Cooper made a trip to Akron. Ohio, the general domicile of the General Tire & Rubber Company, but failed to secure a satisfactory adjustment of the matter. However, he continued, by correspondence, to urge a more favorable arrangement to himself. On March 19, 1929, J. F. Sloate, who represented the General Tire & Rubber Company when the above-mentioned contract was made, came to Clarksdale, and, accompanied by others, had a conference with Cooper and his attorney, E. W. Smith, in which the affairs of the corporation and the business of Cooper were discussed at considerable length, and a writing was drawn and signed by J. F. Sloate, agent of the General Tire & Rubber Company, in duplicate, but he desired that it be submitted to the local attorneys of the General Tire & Rubber Company at Clarksdale for approval either as to form or substance, consequently this writing, or agreement, so drawn in duplicate, was taken to the office of the local attorneys of the Tire & Rubber Company in Clarksdale, and was left there by J. F. Sloate, who seemed to be in a hurry to get away from Clarksdale. On the same day, Cooper and his at-

torney went to the office of these local attorneys for the Tire & Rubber Company, and Cooper was permitted to sign the contract, but the local attorneys insisted that, under the directions given them by Sloate, they had to send both copies to Akron, Ohio, and this was, accordingly, done, and the Akron office of the General Tire & Rubber Company seemed not to have approved the contract, and never returned it. There is conflict as to whether the contract was made subject only to approval as to form or as to substance. It provided, in substance, that on or prior to August 14, 1928, W. S. Cooper was engaged in the gasoline business in Clarksdale, known as the 7-11 Service Station, and that the General Tire & Rubber Company had, prior thereto, advanced to him certain sums of money and certain merchandise. That on the 14th of August, 1928, the General Tire & Rubber Company filed a suit in the chancery court of Coahoma county, Miss., for the purpose of subjecting Cooper and said business to the payment of the indebtedness owing at that time by Cooper; that the Tire & Rubber Company took charge of Cooper's business, together with his assets, which were shown by his books, with the exception of one certain Hupmobile automobile which was later conveyed, as set forth in the contract; that subsequent to said time, by agreement of the parties, a corporation known as "7-11, Inc.," was formed, and that Cooper conveyed all of the assets of said business, and, in addition thereto, one certain Hupmobile automobile, all lease rights of the property occupied by said service station, and the good will of the business. The corporation thus organized issued to Cooper its capital stock, both preferred and common, as a consideration for the conveyance of the aforesaid assets, the "7-11, Inc.," assuming to pay off and discharge the indebtedness owed by W. S. Cooper to the Tire & Rubber Company, and other liabilities of Cooper incurred in the operation and conduct of said business. It was further agreed that Cooper was to trustee all of the stock issued to him by

the corporation in favor of the Tire & Rubber Company, to secure, additionally, the indebtedness owing to it by Cooper which was assumed by the said corporation. In addition to this, Cooper pledged his interest in the Nu Grape Company of Clarksdale, Miss., which interest previously had been reflected on the books of Cooper doing business as the "7-11 Service Station," but which was not conveyed by him to the corporation. It was alleged in the contract that the Tire & Rubber Company, being desirous of acquiring all of the rights and interest of every character of the said W. S. Cooper, undertook and agreed with Cooper as follows: "To cancel and for naught hold that certain chattel deed of trust held by the party of the first part on the interest of the said W. S. Cooper in the Nu Grape Company. II. To cancel and deliver to the said W. S. Cooper those certain notes and deed of trust executed by W. S. Cooper in favor of 7-11 incorporated in the approximate sum of Two Thousand Dollars, representing purchase price of the Ferry Service Station at Friars Point, Mississippi, at and for the sum of Five Hundred Dollars, which said $500.00 is to be paid as hereinafter set out. III. To pay to the said W. S. Cooper in cash the equity of the said W. S. Cooper in and to said 7-11 Service Station, as the same is shown and reflected on the books of the said W. S. Cooper in existence on August 14th, 1928, which said equity shall be determined by an audit of the said books by a competent auditor to be agreed upon by the parties hereto. The said auditor to be directed to arrive at the said equity in said business in the following manner, to-wit, (1) The auditor shall first determine gross liabilities to the party of the first part, or otherwise, of the said W. S. Cooper, doing business as 7-11 Service Station as of August 14, 1928. (2) The said auditor shall next determine the gross assets of the said W. S. Cooper doing business as 7-11 Service Station, as the same are reflected by the books of the said W. S. Cooper, as of August 14, 1928. (3) The said auditor will then subtract from the

assets thus determined the liabilities thus determined, and further subtract the additional sum of $500.00 representing the amount to be paid by the said W. S. Cooper in cancelation of the notes in the amount of two thousand odd dollars, executed by the said W. S. Cooper in favor of 7-11 Incorporated, for the purchase of the Ferry Service Station, Friars Point, Mississippi. The amount thus arrived at by the auditor so selected shall represent the equity of the said W. S. Cooper as of August 14th, 1928, and the party of the first part agrees to pay the said sum in cash to W. S. Cooper. For the consideration above set forth, the said W. S. Cooper agrees to convey all right, title and interest which he may have in 7-11 Incorporated, and the party of the first part agrees to relieve the said W. S. Cooper from any and all liability to the party of the first part by reason of any indebtedness now held or heretofore held against the said W. S. Cooper, and to hold the said W. S. Cooper harmless from any and all liability incurred by 7-11 Incorporated. It is understood and agreed, however, that the personal overdraft of the said W. S. Cooper appearing on the books of 7-11 Incorporated, which said overdraft appeared on the books of W. S. Cooper doing business as 7-11 Service Station, shall be credited with all unpaid salaries and other legitimate credits due and owing to the said W. S. Cooper by 7-11 Incorporated up to and including the date of the signing of this contract, less such amounts as may have been paid to, or may be properly chargeable against the said W. S. Cooper since August 14th, 1928. It being the purpose of this provision to offset such amounts as are reflected by the books of the said W. S. Cooper, as of Aug. 14th, 1928, representing overdrawals of the said W. S. Cooper, on account of salaries by off-setting salaries, services performed and other legitimate credits appearing in the said account, since said date, and since the organization of 7-11 Incorporated. The parties hereto agree to select the auditor herein provided for forthwith, and agree to settle in conform-

ity with this contract immediately after the completion of said audit.''

As stated above, this agreement or contract was drawn by a representative of the General Tire & Rubber Company, and E. W. Smith, the attorney of Cooper, in Smith's office, and was signed, in duplicate, by Sloate, the representative of the Tire & Rubber Company, who desired that it be submitted to the company's local attorneys, and there is a conflict between the parties as to whether it was to be so submitted for approval as to form or as to substance. It was contended by E. W. Smith, as a witness, that it was understood that the agreement was to be submitted as to form only, and the General Tire & Rubber Company contended that it was signed subject to the approval of its local attorneys as to all matters.

It was desired by Cooper and Smith that one copy should be turned over to Cooper, but, as stated, the local attorneys said they had no power to do so, and it was finally agreed that Cooper would sign, but the local attorneys for the Tire & Rubber Company would send the contract to Akron, Ohio, without comment, which was done.

W. S. Cooper sold the filling station at Friars Point, and moved to Jackson, Miss., was employed there, and subsequently died, and this suit is brought by his widow, and administratrix of his estate, to have the court find the value of the assets and liabilities shown on the books of Cooper as of August 14, 1928, and to render a decree in her favor, as administratrix, for any amount found due thereunder.

Voluminous testimony was taken, but it cannot be summarized without extending this opinion to an unnecessary length. After this testimony was taken, the chancellor appointed a master to hear evidence and find values, reporting same to the court, but reserving, in the order appointing the master, the right to set aside his report, and decide the matter de novo. The master re-

ported the matter to the court, stating that the assets of Cooper were of less value than the obligations he owed the General Tire & Rubber Company. This report was excepted to by the attorneys for the administratrix, and, after a review of the evidence, the chancellor decreed in favor of Mrs. Cooper, the administratrix, for the amount found, by an audit of the books, to be due her.

We are of the opinion that there was sufficient testimony in the record to support the findings of the chancellor.

There were differences of opinion among the auditors as to the proper method of making an audit of the books under the stipulations of the contract above referred to, but we think the testimony supported the decree.

It is urged that the chancellor was not warranted in setting aside the report of the master, because the master had evidence before him sufficient to sustain his finding, and the master's report should be given the effect of a verdict by a jury.

We are not here confronted with the decision of this question, because the chancellor, in the order appointing the master, reserved the right to review his finding, and to decide the matter de novo, according to the chancellor's own views about it. We think it was competent for the chancellor to reserve to himself this power and to make the report of the master merely advisory.

After a careful consideration, we think the finding of the chancellor is supported by sufficient evidence, and the suggestion of error will be overruled.

Overruled.