I must dissent from the majority decision because, in a real sense, I do not think the appellants (the adopting parents) have posture to maintain their petition for adoption. My reasons are as follows. Prior to the birth of the baby, the appellants several months earlier on June 1, 1980, signed and executed a document entitled Contract for Designation of Foster Home. The first paragraph (unnumbered) in the Contract provided that the appellants accepted children into their home which they operated as a foster care home "upon the terms, conditions, and understandings contained in Part A of this Contract. . . ." Part A(1) of the Contract provides:
 We understand that the actual permanent legal custody of children placed in our home for Foster Care will remain in either the natural parent or parents of the child or the Department according to the facts of the individual case, and that by placing a child in our home for foster care, the Department does not confer any right to custody in us, and we hereby expressly waive any right to custody of a child placed in our home for Foster Care and expressly agree that we will not attempt to adopt any child placed in our home for Foster Care unless the child is made free for adoption by the written decision and action of the State Department of Public Welfare. (emphasis added)
The Contract also provides:
 We clearly understand that the Department will be attempting as quickly as possible to establish permanent homes for all children entrusted to the Department's custody, preferably in the home of the child's natural parents, and we agree to cooperate with the Department in carrying out the Department's plans for any Foster Child placed in our home, including the plan to return a child to its parents, to transfer a child to another foster home or institution, or any other plan which the Department may have.
 We understand that all foster children placed in our home are wards of the State of Mississippi and we agree to obey all laws of the State of Mississippi regarding foster children and all of the regulations of the State Department of Public Welfare concerning foster children and we expressly agree to the following rules:
 A. We agree to carry out all directions of the Department for care of the foster child and to cooperate. . . .
Paragraph F of Number 4, Part A of the Contract provides:
 F. We agree to deal with the Department and not with the parents, relative to any complaint or suggestions concerning the child. . . .
Part B of the Contract provides that the Department would pay unto the appellants compensation for care of foster children kept by the appellants in their home.
At the trial, the appellants contended, as they argue in their briefs now before us, that there was a binding contractual obligation of the State Welfare Department entered into between Agents of Scott County Welfare Department and the appellants based upon an alleged promise made to them by welfare workers that they could adopt the infant child. They say that they would never have assumed the care of the child "who was gravely ill had they not expected to benefit under promise of final adoption. . . ." After the appellants' testimony about the alleged promise that they could adopt the child, welfare employee McCann testified and denied any promise that the appellants could adopt the child. Scott County social worker Pat Dilley gave similar testimony denying that she indicated to the appellants that they might *Page 533 
adopt the child. In his fact finding, the chancellor, upon sharply disputed conflicting testimony, found against the appellants on the issue of any member of the Welfare Department having promised them anything with reference to their desired adoption of the child.
Upon this record as made it is my considered opinion that the appellants should not be heard to pursue their adoption petition. There seems to be an understanding on the part of the majority of the Court that the Contract somehow or other did not bind the appellants so as to prohibit them from adopting the child. I think the Contract logically can be construed in no other way except as to prohibit these appellants from pursuing their adoption petition. The Contract was within the clear purview of the legislators of this state when they enacted our laws dealing with child welfare. Mississippi Code Annotated section 43-15-5
(Repl. 1981) specifically grants the State Department of Public Welfare the authority and duty to administer and supervise all public child welfare services "including those services, responsibilities, duties and powers with which the county departments of public welfare are charged and empowered in this chapter . . . provide for the care of dependent and neglected children in foster family homes . . ., supervise the care of such children. . . ." There can be no doubt, and indeed it is not even contended in the present case, that the child in question is not a neglected child and under the supervision of the welfare agency of this state.
Mississippi Code Annotated section 43-15-5 (Repl. 1981) vests the department with the duty and power to "administer" a system of plans, etc. for each "neglected" child, which system shall enhance the life of such child and includes the function of placing the child "in a permanent adoptive home." This statute specifically authorizes and recognizes that the welfare department is given the function of placing the child in a permanent adoptive home, which they sought to do in this case in the home of intervening objectors to the adoption petition of the appellants.
Mississippi Code Annotated section 43-15-5 (Repl. 1981) imposes upon the State Department of Public Welfare the responsibility to keep a registry of children of various categories, including under subsection (d) "children freed for adoption." The next succeeding statute, Mississippi Code Annotated section 43-15-19
(Repl. 1981), requires the department to maintain "a Mississippi Adoption Resource Exchange registry, which shall contain a . . . listing of all persons who wish to adopt children. . . ." This same section requires that the registry "be distributed to all county welfare directors" within the state. Section 43-15-5,supra, grants the State Department of Public Welfare the authority and duty to administer or supervise all the welfare services, "including those services, responsibilities, duties and powers with which the county departments of public welfare are charged and empowered in this chapter . . . provide for the care of dependent and neglected children . . . supervise the care of such children. . . ."
There can be no doubt that the contract executed by the appellants is clearly contemplated by the statutory enactments referred to above vesting in the welfare department and directing said department to supervise and manage a system providing for the care of neglected children and their adoption. The statute specifically recognized the keeping of a "registry" list of children suitable for adoption and a list of parents who desired to adopt such children.
It is noted that in the Contract that Part A, subparagraph 1, binds the foster parents (appellants) not to attempt adoption of any child placed in their home for foster care "unless the child is made free for adoption by the written decision and action of the State Department of Public Welfare." There is absolutely nothing, not even a scintilla of evidence in the record, to show that the child in question had become "free for adoption" to the appellants by any written "decision and action" of the welfare department under Part A(1) of the contract executed by the appellants. No such written "decision and action" is referred to or discussed *Page 534 
or relied upon by the majority decision. The reason such a "decision and action" is not referred to is simply this: such a decision is nonexistent. Nowhere in their briefs do the appellants themselves contend that the child was ever made free for adoption by the welfare department's "decision" or "action." According to the clear import of the statutes and the Contract, the child was not free for adoption to these appellants.
As quoted above, pursuant to the Contract the appellants covenanted "to cooperate with the department in carrying out the department's plans for any foster child placed in their home. . . ." Instead of cooperating with the department, they are litigating which is precisely what they covenanted not to do. Clearly, upon this record it was the department's plans for the foster child in question to be placed for adoption according to the registry as authorized by the statutes, supra.
Subparagraph 4, Part A, of the Contract provides that the appellants were obligated "to obey all laws of the State of Mississippi regarding foster children and all of the regulations of the State Department of Public Welfare . . . [and] carry out all directions of the department for the care of the foster child. . . ." To the contrary, rather than carrying out the department's directions the appellants are taking the very opposite position.
The appellants voluntarily executed the document discussed above which was obviously prepared by the Welfare Department as authorized by the statutes of this state. Having done so and thereby become operators of a "foster home," the appellants should not now be heard to seek the adoption of a foster child kept in their home for compensation paid by the State Department of Public Welfare. My view is that persons who renege on a contract (such as that in this record) without which contract they could not have gained possession of the child, are not entitled to use the judiciary to accomplish what the contract prohibits, to-wit: adoption of the child by foster parents.
In their brief, the appellants argue that the chancellor erroneously permitted the "Welfare Department to attempt to place the child for adoption in a home solely based on a list of names secured by the . . . department and not in accordance with the best interest of the infant child." What's wrong with using the list which the cited statutes required? Had the list not been kept, the welfare employees would have been conducting their office in harum-scarum fashion, and in violation of state law. Contention is that the chancellor "abused his discretion by overlooking matters of close emotional ties between the appellants and the infant child." The majority opinion, at least in part, is based upon the subjective rationale that the "child has become attached" to the appellants which may be said of every foster parent situation where persons operate foster care homes. There is no evidence or authority cited in the briefs or the majority decision to the effect that the chancellor was not acting "in accordance with the best interest" of the child.
From the contract discussed above it is clear that the appellants sought money from the State. To qualify for the money, they contracted to receive foster children from the Welfare Department and care for them as "Foster Parents" expressly covenanting (1) that they waived any right to custody of any such child, and (2) that they would not attempt to adopt any such child. On these conditions the appellants accepted from the Welfare Department several children including the child in controversy. They received pay for their services. One of the appellants (the adopting mother), was asked if she read the contract before signing it and she said, "I'm sure I did." When the child became hospitalized, the Welfare Department paid the expenses, and at the time of the trial the appellants were still receiving foster care payments.
Another important factual aspect of the case is that when the appellants obtained the natural parents' consent for the appellants to adopt the subject child, the appellants knew that the natural parents had already "signed their children for *Page 535 
adoption." The appellants knew that the children had not been "signed" to them (appellants) for any purpose except as foster parents but were "signed" to the welfare department. Such a surrender by the natural parents is irrevocable upon the record according to our recent decision in C.C.I. v. Natural Parents,398 So.2d 220 (Miss. 1981).
The majority decision of this Court will have the effect of totally disrupting and impairing the State Department of Public Welfare and every county welfare department in this state with reference to neglected children being placed for adoption. This Court is effectively nullifying the statutes cited and discussed above. Surely this Court does not mean that somehow the child was "freed for adoption" by its name being placed on the statutory adoption registry. The registry is required by our state statutes so as to enable the welfare offices to expedite adoption proceedings in an orderly manner. To allow the appellants to prevail here is in effect saying to them and to the whole world that once a child's name is placed on the registry, then the first adoption petitioners who win the "foot race" and beat all others to the courthouse door and file their petition first will somehow have priority over anyone else who has obeyed the law and gotten on the list by proper application and complying with established procedures. This just cannot be the intent of the legislature in enacting the statutes referred to above, and does not comport with good operational policies and standards which we should applaud and uphold. The welfare agencies should be permitted to operate in an orderly manner. The list of children is not the product or dream of some bureaucrat but is required by law. Such a list can be useful only if there is also kept a list of approved parents who have been investigated and found to be suitable and somehow matching the interest and needs of the child to be adopted. By its decision this Court has sanctioned the appellants' unjustifiable repudiation of a solemn contract and allowed them to make an "end run" thereby magically projecting themselves ahead of the statutory list of others who seek to adopt a child in accordance with established procedures mandated by the legislature. The majority decision will render the list required by law to be meaningless and an exercise in futility. In this particular instance it is interesting to note that another child, a brother or sister of the child in issue, has already been placed with the other (would-be) adopting parents on the list of the welfare department. The action of the majority here is simply to encourage that these two siblings may be kept separate rather than together, which is contrary to nature itself. More importantly, the majority decision inevitably will have a chilling impact upon the efforts of welfare department administrators and employees to enhance the status of little children who should prudently and carefully be placed in homes for proper care. According to the majority decision, established orderly procedures used by the various welfare offices are being cast aside without judiciously considering their merits or logic. The majority decision, as I view it, is contrary to state law as expressed by the above-cited statutes which at trial were not even challenged on constitutional or public policy grounds.
The opinion adjudicates that the chancellor was "manifestly" in error when he "excluded the appellants from consideration as adoptive parents." This is specifically what they contracted when for valuable considerations, they covenanted not to seek to adopt the child absent some "written decision and action" of the welfare department which clearly is not in evidence. Also, the majority opinion states "the child's best interest" must be the primary concern. Effectively, this Court is stating that the chancellor erroneously failed to make a finding on either the facts or law as to the child's "best interest." In this regard, the welfare department in its answer denied that the appellants "are fit and suitable," and also denied that "it is in the best interest" of the child that appellants be granted the adoption. Upon these pleadings, after the testimony was presented, the chancellor made no specific finding on (1) the appellants' *Page 536 
fitness as adopting parents, or (2) the child's "best interest." Under Mississippi Code Annotated section 11-5-87 (1972), when requested by a litigant, the chancery court "shall find the facts specially and state separately its conclusions of law. . . ." Here, no such finding was requested as to appellants' "fitness" or the child's "best interest" on which issue no request for a finding or ruling was made at trial. See McIntosh v. McIntosh,378 So.2d 629 (Miss. 1980); Gates v. Hinton, Miss., 27 So.2d 686 (1946). We held in General Tire Rubber Co. v. Cooper,176 Miss. 491, 165 So. 420 (1936), that unless a request is made pursuant to what is now section 11-5-87, or unless the chancellor made no attempt to comply with such a request, we will not remand for him to address an issue not specifically ruled upon at the first trial of the cause. Here the appellants made no such request, and for good reason. This is so because throughout all the testimony of the appellants themselves, a medical doctor, several welfare employees and other witnesses, not one question was propounded on whether the adoption sought by appellants would be in the child's "best interest." Having charged in their petition that the adoption by them would be "in the best interest" of the child, they assumed the burden of establishing the child's "best interest" which they failed to do. No witness at all was asked about the child's "best interest" and no witness uttered the words under discussion. Upon such a deficient record, the majority decision holds that the chancellor erred in not deciding the case upon "the child's best interest." I am unwilling to hold the chancellor in error when there was not a question asked which even mentioned the "child's best interest."
Accordingly, I dissent, and will add that the Court is making a mistake which will result in seriously and unjustifiably impairing a state agency which has a most vital function: caring for neglected children.
PATTERSON, C.J., and SUGG, P.J., join this dissent.